IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 09-cv-00858-WJM-MEH

EBONIE S., a child, by her mother and next friend, Mary S.,

      Plaintiff,

v.

PUEBLO SCHOOL DISTRICT 60,
MARILYN GOLDEN, Teacher, in her official and individual capacities,
GARY TRUJILLO, Principal, in his official and individual capacities,
MARY JO BOLLINGER, Executive Director of Exceptional Student Services, in her official and individual capacities,
LOUISE RIVAS, Paraprofessional, in her official and individual capacities,
SHARON WELLS, Paraprofessional, in her official and individual capacities,
ISABEL SANCHEZ, Paraprofessional, in her official and individual capacities,
AUDRA MARTINEZ, Paraprofessional, in her official and individual capacities, and
KRISTEN POTTER, Paraprofessional, in her official and individual capacities,

      Defendants.

---

## ORDER ON MOTIONS TO EXCLUDE

---

**Michael E. Hegarty, United States Magistrate Judge.**

      Before the Court are Defendants' Joint Motion to Exclude Expert Testimony of Dr. Phillip Strain [filed February 28, 2011; docket #122], Defendants' Joint Motion to Exclude Expert Testimony of Dr. Helena Huckabee [filed February 28, 2011; docket #123], and Plaintiff's Motion to Exclude Proffered Expert Testimony of Paul Spragg [filed March 2, 2011; docket #128]. All motions have been referred to this Court for disposition. The motions are fully briefed, and the Court held evidentiary hearings on the motions on April 14, 2011 and April 20, 2011 (the Court allowed supplemental briefs following the hearing as well). For the reasons that follow, the motions are **granted in part and denied in part**.

## I.     Background

This case was initiated by the Plaintiff, Mary S. on behalf of a minor, Ebonie S., a developmentally disabled child, who was a kindergarten student at Bessemer Academy in Pueblo School District No. 60 (hereinafter "District") for the school year 2006-07.[1]  Based upon alleged conduct involving restraint of Ebonie in a "wraparound" desk in the classroom, Plaintiff has asserted claims against the Defendants for violation of Section 504 of the Rehabilitation Act of 1973, 42 U.S.C. §§ 794 *et seq.*, and for violation of Title II of the Americans with Disabilities Act, 42 U.S.C. §§ 12101 *et seq.*[2]  A full recitation of the facts of this case may be found in Judge Martinez' May 3, 2011 order on Defendants' motions for summary judgment.  *See* docket #159.

In support of her claims, Plaintiff has designated Dr. Helena Huckabee, Clinical Pediatric Neuropsychologist, and Dr. Phillip Strain, Professor and Director of the Positive Early Learning Experiences Center at the University of Colorado at Denver, as experts who are expected to testify as to standard of care, causation and damages.  Defendants have designated Dr. Paul Spragg, Founder, President and Executive Director of Developmental Disability Consultants, P.C., as an expert to rebut Dr. Huckabee's and Dr. Strain's testimony.  The motions at issue here challenge all

---

[1]There is some indication that Ebonie may have been placed in a wraparound desk during the 2005-06 school year in the District as well, but the emphasis in this case appears to be on Ebonie's time at Bessemer Academy the following school year.

[2]Plaintiff also alleged various claims for constitutional violations under 42 U.S.C. § 1983 against the District and individual staff members for: (1) violation of the Fourth Amendment constitutional guarantee against unlawful searches and seizures; (2) violation of the constitutional right to substantive due process; (3) deprivation of liberty without due process; and (4) violation of the Equal Protection Clause of the Fourteenth Amendment.  Plaintiff also alleged claims against the District and its supervisory staff pursuant to Section 1983 for failure to train and supervise.  However, these claims were dismissed on summary judgment on May 3, 2011.

named experts pursuant to Fed. R. Evid. 702.

## II.    Legal Standard

Federal Rule of Evidence 702 states, in pertinent part,

[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702. As the rule makes clear, while required, it is not sufficient that an expert be qualified based upon knowledge, skill, experience, training, or education to give opinions in a particular subject area.  Rather, the Court must "perform[ ] a two-step analysis." *103 Investors I, L.P. v. Square D Co.,* 470 F.3d 985, 990 (10th Cir. 2006). After "determin[ing] whether the expert is qualified by 'knowledge, skill, experience, training, or education' to render an opinion," *id.* (quoting Fed. R. Evid. 702), the specific proffered opinions must be assessed for reliability. *See id.*; *see also* Fed. R. Evid. 702 (requiring that the testimony be "based upon sufficient facts or data," be the "product of reliable principles and methods," and reflect a reliable application of "the principles and methods ... to the facts of the case").

Rule 702 "imposes on the district court a gatekeeper function to 'ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable.'" *United States v. Gabaldon,* 389 F.3d 1090, 1098 (10th Cir. 2004) (quoting *Daubert v. Merrell Dow Pharms., Inc.,* 509 U.S. 579, 589 (1993)). To execute that function, the Court must "assess the reasoning and methodology underlying the expert's opinion, and determine whether it is both scientifically valid and applicable to a particular set of facts." *Dodge v. Cotter Corp.,* 328 F.3d 1212, 1221 (10th Cir.

2003) (citing *Daubert,* 509 U.S. at 592-93). When assessing reliability, "the court may consider several nondispositive factors: (1) whether the proffered theory can [be] and has been tested; (2) whether the theory has been subject to peer review; (3) the known or potential rate of error; and (4) the general acceptance of a methodology in the relevant scientific community." *103 Investors I,* 470 F.3d at 990 (citing *Daubert,* 509 U.S. at 593-94). These considerations are not exhaustive. Rather, "the trial judge must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable." *Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 152 (1999).  Ultimately, the test requires that the expert "employs in the courtroom the same level of intellectual rigor that characterizes the practice of any expert in the relevant field." *Id.*

While the proponent of the challenged testimony has the burden of establishing admissibility, its proffer is tested against the standard of reliability, not correctness; a proponent need only prove that "the witness has sufficient expertise to choose and apply a methodology, that the methodology applied was reliable, that sufficient facts and data as required by the methodology were used and that the methodology was otherwise reliably applied." *United States v. Crabbe,* 556 F. Supp. 2d 1217, 1221 (D. Colo. 2008) (citing *Mitchell v. Gencorp Inc.*, 165 F.3d 778, 781 (10th Cir. 1999)).

## III.   Analysis

The parties in this case entered into a stipulation as to the order of witnesses to be heard at the evidentiary hearing.  The Court will address the parties' challenges to each expert witness in the same order.

### 1.   Helena Huckabee

Dr. Helena Huckabee is a licensed Clinical Pediatric Neuropsychologist, a licensed Clinical

4

Psychologist, and a Board Certified Behavior Analyst.  She received her Masters degree in 1998 and her Ph.D. in Clinical Psychology in 2003, both from the University of Houston. Dr. Huckabee completed an internship at Baylor College of Medicine with Post Doctoral Fellowships at DePelchin Children's Center in 2002-2003 and JFK Center for Developmental Disabilities at the University of Colorado Health Sciences Center in 2003-2005.  She has experience performing psychological and neuropsychological evaluations for children with developmental disabilities.  Dr. Huckabee has published, presented and taught on behavioral issues, more recently on those concerning children with developmental disabilities.  Through her current practice, Emerge P.C. (characterized as "Professionals in Autism, Behavior & Personal Growth"), she regularly designs and supervises treatment plans for children with disabilities.

The Plaintiff retained Dr. Huckabee to conduct a neuropsychological evaluation of Ebonie to determine whether she suffered long-term damage from being allegedly subjected to restraint in the wraparound desk at Bessemer Academy in 2006-07 and, now, the Plaintiff offers Dr. Huckabee as an expert on causation and damages in this case.  Defendants do not generally challenge Dr. Huckabee's qualifications to render an opinion in this case.  After reviewing Dr. Huckabee's curriculum vitae and hearing her testimony, the Court finds that Dr. Huckabee is qualified by 'knowledge, skill, experience, training, or education' to render an opinion concerning causation and damages in this case.

Defendants' Rule 702 motion challenges Dr. Huckabee's expert testimony arguing that three of Dr. Huckabee's primary opinions are not based upon reliable methodology.

      a.     Opinion: Ebonie has been harmed by the "pernicious effects" of restraint by staff at Bessemer.

Defendants infer from Dr. Huckabee's report that she opines Ebonie has suffered both

cognitive injury (little or no progress in the personal and social skills necessary for daily activities) and psychological injury.[3]  With respect to cognitive injury, Defendants argue that Huckabee's methodology and application of the methodology to the facts are unreliable.  For instance, Defendants claim that the composite score of the Vineland Adaptive Behavior Scales (VABS) II test completed by Ebonie's mother in 2009 was higher than Ebonie's mother's score in 2006, which is contrary to Dr. Huckabee's opinion concerning Ebonie's lack of progress.  Apparently, Dr. Huckabee attempted to explain in her deposition that rising scores do not necessarily demonstrate a rise in progress; however, Defendants aver that the logic of Dr. Huckabee's statement then follows that rising scores is also not reliable to demonstrate a lack of progress.  Moreover, Defendants argue that Dr. Huckabee fails to account for the fact that persons with Down syndrome develop more slowly as they get older, and she fails to consider the other disabilities Ebonie suffers, as well as her early neglect, exposure to toxins and abrupt school transitions.

The Court finds that Defendants' challenges go to the weight of Dr. Huckabee's testimony rather than its admissibility.  At the hearing, Dr. Huckabee explained her methodology, the assessments she used with Ebonie to determine any cognitive impairment, and how each assessment is scored and analyzed.  Defendants do not question Dr. Huckabee's qualifications to conduct and evaluate such assessments.  In fact, Defendants do not question Dr. Huckabee's choice of assessments or the fact that they should be used for the purpose of determining cognitive injury.  Thus, any attempts by Defendants to "poke holes" in Dr. Huckabee's application of the methodology

---

[3]To the extent that Dr. Huckabee's report may be construed as opining about Ebonie's physical health, Plaintiff's counsel confirmed at the hearing that Dr. Huckabee will not be offered to testify concerning Ebonie's broken arm or any other alleged physical injuries.  The Court agrees that Dr. Huckabee is not qualified and may not be offered to testify as to any physical injuries allegedly sustained by Ebonie.

in this case must be heard by the jury.

Defendants contend that Dr. Huckabee's reliance upon assessments completed by Ebonie's mother is improper. An expert's opinion based solely on the self-serving statements of an interested party may be excluded for lack of foundation. *Mooring Capital Fund, LLC v. Knight*, 388 F. App'x 814, 821 (10th Cir. 2010) (citing *Champagne Metals v. Ken-Mac Metals, Inc.*, 458 F.3d 1073, 1080 n. 4 (10th Cir. 2006)). According to the testimony, at least some of the assessments used by Dr. Huckabee, including the Behavior Assessment Scales for Children (BASC), are meant to be completed by a parent and a caregiver, such as a teacher. In fact, the assessments performed by the District in 2006 were apparently completed both by Ebonie's mother and her teacher(s). Dr. Huckabee testified that, in 2009, the assessments she sent to Ebonie's teachers for response were never returned, and that such assessments were completed only by Ebonie's mother. However, Dr. Huckabee also stated that, in addition to her evaluation of the assessments, she relied upon her own experience, a review of research articles, a review of Ebonie's records and her observation of Ebonie to reach her conclusion regarding cognitive injury to Ebonie. Thus, any impact Ebonie's mother's responses may have upon the validity of the assessments themselves must be determined by a jury.

With respect to psychological injury, Dr. Huckabee concludes that Ebonie suffers from Anxiety Disorder NOS (Not Otherwise Specified) and Oppositional Defiant Disorder. Defendants contend that Dr. Huckabee's use of the "catch-all" diagnosis of Anxiety Disorder NOS is improper in that it may include a number of different maladies and contains no reliable means specified for how the 2009 diagnosis can be traced back to the 2006-07 school year. Moreover, Defendants

argue that Dr. Huckabee's "diagnosis"[4] of Post-Traumatic Stress Disorder (PTSD) arose after she conducted an experiment on Ebonie with a latch board to simulate the wraparound desk, but the method was neither accurate nor reliable. Defendants further claim that no data exists from which Dr. Huckabee can draw the conclusion that Ebonie's behavior problems increased while she attended Bessemer. Finally, Defendants complain that Dr. Huckabee fails to include in her report the results of a behavior assessment relied upon for her conclusions.

The Court finds that Defendants' challenges with respect to the diagnosis of Anxiety Disorder go to the weight of Dr. Huckabee's testimony. Again, Defendants do not question Dr. Huckabee's qualifications as a pediatric neuropsychologist who specializes in evaluating and treating children with developmental disabilities. Any questions as to the temporal proximity of Dr. Huckabee's diagnosis should be determined by the jury. Likewise, whether Dr. Huckabee's experiment using the latch board with Ebonie was an accurate simulation is a question of fact for the jury, and the jury should hear both the favorable and any unfavorable aspects of Dr. Huckabee's evaluation and conclusion from the experiment.

As to Defendants' claim that no data exist from which Dr. Huckabee can conclude that Ebonie's behavior problems increased while at Bessemer, the Court disagrees. Dr. Huckabee testified that Ebonie's mother reported an increase in behavior problems. *See also* Neuropsychological Evaluation by Helena Huckabee, docket #123-1 at 3. To the extent that Defendants have contrary evidence, such evidence should be heard by the jury. Finally, Dr. Huckabee testified that she did not include the actual results of Ebonie's behavior assessment in her

---

[4]PTSD does not actually appear in Dr. Huckabee's Diagnostic Impressions in her report; however, Plaintiff's counsel confirmed at the hearing that they intend for Dr. Huckabee to testify as to her findings regarding PTSD.

report due to privacy concerns.  The jury may hear this testimony, together with rebuttal testimony, to determine its impact, if any, on the validity of Dr. Huckabee's conclusions.

> b.   Opinion: The cognitive and psychological harms to Ebonie were caused by the District's restraint of Ebonie in the wraparound desk.

Defendants contend that Dr. Huckabee uses no reliable scientific or medical evidence to support her causation theories. According to Defendants, Dr. Huckabee must, but does not, demonstrate a general causation theory (*i.e.*, a child can suffer permanent harms from sitting in a wraparound desk during kindergarten), then apply the theory specifically to Ebonie to determine whether Ebonie's injuries were caused by restraint in the desk.  Further, Defendants argue Dr. Huckabee cites no research nor studies to support her conclusions regarding the effects of restraint on a child allegedly forced to sit in a wraparound desk.  That is, Defendants contend that none of the research includes empirical measures and/or comparisons over time; the articles Dr. Huckabee cites have no relation to the effects of being forced to sit in a wraparound desk; and one particular article concedes that "further research is needed to determine the effect of restraint on children."

In demonstrating that an expert's testimony is reliable, a "plaintiff need not prove that the expert is undisputably correct or that the expert's theory is generally accepted in the scientific community." *Bitler v. A.O. Smith Corp.*, 400 F.3d 1227, 1233 (10th Cir. 2004) (internal quotation marks omitted).  "Instead, [a] plaintiff must show that the method employed by the expert in reaching the conclusion is scientifically sound and that the opinion is based on facts which sufficiently satisfy Rule 702's reliability requirement." *Id.* (internal quotation marks omitted).

Dr. Huckabee testified at the hearing that she reviewed Ebonie's past medical and educational records (including Individual Education Plans); reviewed several articles concerning the effects of restraint; interviewed Ebonie's mother; administered eleven (11) different

psychological assessments; and personally observed and evaluated Ebonie in a clinical setting to reach her conclusion that Ebonie suffered permanent cognitive and psychological harm from being restrained in the wraparound desk. Dr. Huckabee explained that, although the psychological research she reviewed did not particularly concern the effects of restraint upon young children with developmental disabilities, such research does not, and should not, exist because of the moral and ethical prohibitions of placing disabled children in various types of restraint. However, according to Dr. Huckabee, extrapolating results of studies on one population to other similar populations is a commonly accepted practice, such as when medical professionals rely upon tests performed on animals, rather than on humans.

With that said, the Court believes an opinion that answers the ultimate question in the case - here, whether Defendants intentionally discriminated against Ebonie or were deliberately indifferent to Ebonie's rights against discrimination - impermissibly encroaches upon the jury's function as factfinder in this case. Dr. Huckabee refers to Ebonie as a victim of "abuse" by the District in various portions of her report and expressly opines that the District, in "abusive[ly] restrain[ing]" Ebonie, caused her cognitive and psychological harm. However, an expert's duty is to inform the jury on issues the jurors may not otherwise know as lay persons. Therefore, with respect to causation in this case, Dr. Huckabee may testify as to her knowledge of the adverse psychological and/or cognitive consequences of restraint, and as to any psychological and/or cognitive harms she believes Ebonie suffered as a result of restraint in the wraparound desk. Dr. Huckabee may also summarize the scientific evidence and express an opinion that the evidence is consistent or inconsistent with the allegations of harm in this case. However, Dr. Huckabee may not opine as to whether she believes the Defendants "abused" Ebonie, knowingly discriminated against her or were

deliberately indifferent to her rights. *See Wilson v. Muckala*, 303 F.3d 1207, 1218 (10th Cir. 2002) ("Expert testimony on the psychological and emotional traits of abuse victims is typically admissible, so long as the witness makes no comment on the alleged victim's credibility, *or identifies the alleged victim as a victim of abuse*.") (emphasis added); *see also United States v. Charley*, 189 F.3d 1251, 1264 (10th Cir. 1999) (affirming trial court's allowance of testimony by a pediatrician informing the jury of characteristics in sexually abused children and describing the characteristics the alleged victim exhibits).

Defendants' concerns regarding Dr. Huckabee's reliance on "non-similar" research goes to the weight, not the admissibility, of Dr. Huckabee's testimony.  As set forth above, Defendants do not challenge Dr. Huckabee's qualifications, and she testified that she has conducted over one thousand evaluations of children over the course of her career using the same, or similar, tests as those used with Ebonie; she specializes in evaluating children with developmental disabilities; she has worked directly with approximately one hundred children with Down syndrome; and she asserts that approximately 25% to 33% of the children with whom she has worked have attendant behavior problems (comorbidity), just as Ebonie does in this case.

Defendants also point to an "inconsistency" in Dr. Huckabee's testimony that harm suffered by Ebonie in her early years, such as abuse and neglect, has likely dissipated over the years, but the harm suffered as a result of the alleged restraint is permanent.  Dr. Huckabee explained that any repetition of the restraint would have eroded the trust Ebonie had in the school and with her mother. Again, the Court finds that any such inconsistency goes to the weight of Dr. Huckabee's testimony rather than its admissibility.

Finally, Defendants' challenge to Dr. Huckabee's reliance on facts that may not be accurate

may also be addressed on cross examination. The jury will have the opportunity to assess the weight of Dr. Huckabee's conclusions considering all facts presented. The Court finds that Dr. Huckabee's methods in reaching her conclusion are scientifically sound and may simply be based upon disputed facts in the record, which must be heard by a jury. *See Bitler*, 400 F.3d at 1233 ("[a] plaintiff must show that the method employed by the expert in reaching the conclusion is scientifically sound and that the opinion is based on facts which sufficiently satisfy Rule 702's reliability requirement.").

      c.      Opinion: As a result of the injuries caused by the District's restraint, Ebonie will need full-time care for the rest of her life, costing approximately $2,959,020.00.

Following the Diagnostic Impressions stated in her report, Dr. Huckabee lists several Recommendations for the care and treatment of Ebonie to "remediate" the injuries she allegedly sustained while restrained in the wraparound desk, and includes an approximation of the costs of recommended services. Defendants counter that Dr. Huckabee provides no correlation between her projected cost of services and Ebonie's attendance at Bessemer. That is, Dr. Huckabee failed to consider services Ebonie would need even if Ebonie had not attended Bessemer, particularly considering that it is undisputed Ebonie needed full-time care *before* attending Bessemer. Moreover, Dr. Huckabee proffers no opinion that, "Ebonie could have lived independently as an adult, but for attending Bessemer."

In reviewing an expert's testimony, "[t]he focus, of course, must be solely on principles and methodology, not on the conclusions they generate." *Daubert*, 509 U.S. at 595. But, "an expert's conclusions are not immune from scrutiny: 'A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered.'" *Dodge v. Cotter Corp.*, 328 F.3d 1212, 1222 (10th Cir. 2003) (quoting *General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)).

At the hearing, the Court expressed its own reservations concerning Dr. Huckabee's lack of explanation correlating the Recommendations with Ebonie's alleged injuries caused by the wraparound desk. Dr. Huckabee conceded that the medication management services (listed in Appendix 2 of her report) would be necessary for Ebonie absent any alleged improper conduct by the District; thus, Dr. Huckabee may not testify that the cost of such services should be borne by the Defendants. Likewise, Dr. Huckabee testified that the following Recommendations did not arise from any injuries caused by the District's alleged conduct: Nos. 5, 8 and 11. Therefore, at trial, Dr. Huckabee may not testify regarding these Recommendations nor any services listed in Appendix 2 that relate to these Recommendations. Finally, Dr. Huckabee testified that Recommendations Nos. 3 and 4 arose to remediate cognitive and psychological injuries directly caused by Defendants' conduct and the remaining Recommendations, Nos. 1, 2, 6, 7, 9 and 10, arose to remediate injuries (disabilities) made worse by Defendants' alleged conduct. The Court finds that Dr. Huckabee may testify as to Recommendations Nos. 1, 2, 3, 4, 6, 7, 9 and 10 and the accompanying services; it will be left to the jury to determine the extent to which Defendants' alleged "worsening" of Ebonie's disabilities may impact the scope and length of any services provided.

Defendants contend that Dr. Huckabee fails to explain how any lack of progress by Ebonie made over the course of three years (2006 to 2009) equates to a lifelong condition. Defendants point to Dr. Huckabee's conclusion in her report, "[i]n all likelihood, [Ebonie] will experience the pernicious effects of abuse by staff at Bessemer for the rest of her life." The Court finds that it is for the jury to determine the extent, duration and scope of any injuries Ebonie may have suffered as a result of the alleged restraint.

With that said, the Court notes that Dr. Huckabee's recommended services listed in

13

Appendix 2 assume Ebonie will live to be 70 years old; however, as set forth above, Dr. Huckabee is not qualified to opine as to Ebonie's physical health, Plaintiff concedes she is not a medical expert (Response at 5 n.4, docket #137), and there is nothing in the record indicating that Dr. Huckabee possesses qualifications by which to evaluate and determine a person's life span.[5] *See J.B. Hunt Transp., Inc. v. General Motors Corp.*, 243 F.3d 441, 444-45 (8th Cir. 2001) ("[e]xpert testimony that is speculative is not competent proof and contributes nothing to a legally sufficient evidentiary basis."). Therefore, the Court finds that Dr. Huckabee may not testify as to Ebonie's life expectancy at trial. Rather, to the extent she has actual knowledge, Dr. Huckabee may testify as to the projected cost(s) of the appropriate recommended services only per unit (daily, weekly, monthly, annually). The jury may then identify the type and duration of services to be provided Ebonie, if any.

        d.     Additional Concerns

During the hearing, the testimony revealed that a report relied upon in part by both Dr. Huckabee and Dr. Strain contains an error. The report reveals the findings and conclusions of an investigation at Bessemer Academy conducted by The Legal Center for People with Disabilities and Older People during the school year 2007-08. The report states the following: "Information contained in documents provided to The Legal Center by Bessemer Academy does not evidence when, how often or why [Ebonie] was restrained in the secure wrap-around table. However, *the August 27, 2007 tour of the school and special education room provided The Legal Center the opportunity to directly observe [Ebonie]* and other special education students in the secure wrap-

---

[5]Notably, Dr. Huckabee conceded during the hearing that more recent studies conclude a person with Down syndrome has an average life expectancy of only 60 years; thus, to the extent that Dr. Huckabee relies on studies concerning the average life span of a person with Down syndrome, the total costs listed on Appendix 2, nevertheless, are inaccurately projected.

around tables." Docket #137-1 at 5 (emphasis added). At the hearing, Plaintiff's counsel affirmed defense counsel's proffer that Ebonie did not attend and was not present at Bessemer Academy on August 27, 2007. Thus, the report is inaccurate as to the investigator's personal observation of Ebonie at Bessemer Academy,[6] and any reliance by the experts upon this limited portion of the report is improper.

Also, with respect to Dr. Huckabee's Recommendation No. 4, she inserts new opinions concerning aggressive behavior in children into the recommendation. The opinions are more properly placed among Dr. Huckabee's conclusions and may prove confusing to a jury if they remain, or are stated, within the recommendation.

In sum, the Court will exclude only those portions of Dr. Huckabee's testimony specified herein; in all other respects, Dr. Huckabee may testify at trial as to Plaintiff's injuries, her theory concerning causation, and her recommendations to remediate Plaintiff's damages.

2.    Phillip Strain

Dr. Phillip Strain is a Professor of Educational Psychology and Psychiatry, and Director of the Positive Early Learning Experiences Center at the University of Colorado Denver. Over the course of thirty-four years, Dr. Strain has evaluated and educated children with developmental disabilities and special needs. He has authored over 200 scientific papers, primarily concerning behavioral issues in special needs children in the school setting, and has secured over $38 million

_____

[6]A separate portion of the report leads the Court to believe that the author simply erred or misstated his or her personal observation of Ebonie at Bessemer in August 2007; under the report's Factual Findings and Conclusions section, the author concludes that Ebonie was "routinely restrained" in the wraparound desk during the 2006-07 school year, while *other children in the Special Education Program at Bessemer* were "routinely restrained" in the wraparound desks during both the 2006-07 and *2007-08* school years.

in federal funding and grants related to children's educational issues, social and emotional development and problem behavior.

Dr. Strain earned a Masters degree and a Doctorate in Special Education at Peabody College in 1974. He was an Associate Professor of Psychiatry and Special Education, and the Director of the Early Childhood Intervention Program at the University of Pittsburgh from 1980 to 1990. Dr. Strain then served as Director of the Early Childhood Intervention Program and Professor of Psychiatry for the Medical College of Pennsylvania from 1990 to 1993. Currently, he is a Professor of Educational Psychology from 1995 to the present at the University of Colorado at Denver.

The Plaintiff retained Dr. Strain to observe and evaluate Ebonie in school settings and, now, the Plaintiff offers Dr. Strain as an expert on the standard of care in special education. Defendants do not generally challenge Dr. Strain's qualifications to render an opinion in this case. After reviewing Dr. Strain's curriculum vitae and hearing his testimony, the Court finds that Dr. Strain is qualified by 'knowledge, skill, experience, training, or education' to render an opinion concerning the standard of care in this case.

Defendants' motion challenges the Dr. Strain's expert testimony to the extent that it relates to causation and damages, primarily because he is not a licensed psychologist and because he evaluated Ebonie, prepared his report, then destroyed his file regarding Ebonie all before this litigation commenced.[7] Defendants assert they are unduly prejudiced by the lack of Dr. Strain's handwritten notes of his evaluation of Ebonie and any other documents contained in the file for which they may not have copies. In addition, Defendants challenge Dr. Strain's "lack" of

---

[7]Prior to this lawsuit, Dr. Strain was retained by the Plaintiff to testify as her expert at a due process hearing conducted in the adjudication of Plaintiff's administrative complaint brought pursuant to the Individuals with Disabilities Education Act (IDEA).

methodology and application of any methodology to the facts for each of his eight numbered opinions and conclusion.

Plaintiff responds that, although Dr. Strain is not a licensed psychologist, he has experience and training in the specialized area of early childhood development in education particularly for special needs children, and he is offered in this case as a "standard of care" expert. Specifically, the Plaintiff intends the scope of Dr. Strain's testimony to include Ebonie's problem behavior, the alleged improper ways the District addressed her behavior and the reasons why the District's alleged use of restraint was unreasonable and unjustified. Plaintiff argues that, in preparing his report, Dr. Strain reviewed numerous District documents, including Ebonie's IEPs and other reports from 2005-2008, and observed Ebonie at two schools following her time at Bessemer Academy. Arguably, Dr. Strain has decades of experience and observation of many children in classroom settings, and Plaintiff contends his reliance on the observations and/or conclusions of others goes to the weight, not the admissibility of the evidence. Moreover, Plaintiff asserts that Defendants are not prejudiced by the absence of Dr. Strain's file, because they have copies of all documents contained in the file, and they had access to and cross-examined Dr. Strain at the February 2009 due process hearing.

With respect to destruction of the file, the Court agrees that prejudice could possibly inure to the Defendants due to the lack of the existence of Dr. Strain's notes concerning Ebonie. However, considering Defendants' failure to take Dr. Strain's deposition in this case or otherwise elicit testimony during the hearing establishing the extent of the notes, the Court finds that the record is insufficient to establish any alleged prejudice that alone might justify exclusion of any of Dr. Strain's opinions.

The primary issue raised by the Court at the evidentiary hearing in this case concerns

possible duplication of Dr. Strain's and Dr. Huckabee's testimony concerning Ebonie and any confusion such duplication may engender. Specifically, Dr. Strain concludes that Ebonie suffered "negative consequences" from the alleged restraint in the wraparound desk, and his recommendation for the services of a certified behavior analyst to remediate those "negative consequences" appears to be nearly identical to Dr. Huckabee's Recommendations Nos. 3 and 4. In response, Plaintiff argued at the hearing and in her supplemental briefing that Dr. Strain's testimony is different in its approach, and that she will be prejudiced if Dr. Strain is excluded "especially with respect to all of his opinions regarding educational policies and practices and the standard of care for school administrators, teachers, and paraprofessionals and Defendants' breach thereof." *See* docket #148 at 5.

The Court is not completely persuaded. First, Plaintiff brings no negligence claims in this case; therefore, the identification of a standard of care and whether any party breached it appears, on its face, to be irrelevant. Second, Plaintiff contends that Dr. Strain's testimony is necessary for consideration of her Fourth Amendment unlawful seizure claim. While the Court understands Plaintiff's argument that Dr. Strain's testimony may assist the jury in determining whether the District's use of the wraparound desk was reasonable, some courts have found that expert testimony concerning a reasonableness determination in the Fourth Amendment context may not be proper. *See, e.g., Marquez v. City of Albuquerque*, 399 F.3d 1216, 1222 (10th Cir. 2005) (affirming trial court's exclusion of expert testimony concerning minimum use of force and law enforcement standards in the determination of the reasonableness of a police officer's conduct); *see also Casey v. Lor*, No. 05-cv-01013-REB, 2008 WL 2705385, at *2 (D. Colo. July 2, 2008) (unpublished) (excluding expert testimony on same basis). Furthermore, the Court acknowledges that some courts

18

have admitted expert testimony on the standard of care for a determination of a supervisor's conduct. Nevertheless, the Court need not reach these issues; as set forth above, Judge Martinez has dismissed the Fourth Amendment Unlawful Seizure and Fourteenth Amendment Failure to Train or Supervise claims on summary judgment. *See* docket #159.

The remaining claims in this case are brought pursuant to the Americans with Disabilities Act ("ADA") and the Rehabilitation Act. To succeed on a claim under Title II of the ADA, a plaintiff must establish: (i) that she is a qualified individual with a disability; (ii) that she was either excluded from participation in or denied the benefits of some public entity's services, programs, or activities or was otherwise discriminated against; and (iii) that such exclusion, denial of benefits, or discrimination occurred because of the plaintiff's disability. *See* 42 U.S.C. § 12132; *see also Parker v. Universidad de P.R.,* 225 F.3d 1, 5 (1st Cir. 2000). "[I]ntentional discrimination can be inferred from a defendant's deliberate indifference to the strong likelihood that pursuit of its questioned policies will likely result in a violation of federally protected rights." *Powers v. MJB Acquisition Corp.*, 184 F.3d 1147, 1153 (10th Cir. 1999).

To state a claim under Section 504 of the Rehabilitation Act, a plaintiff must allege (1) he or she "is an individual with a disability"; (2) he or she "is otherwise qualified to receive the benefit"; (3) he or she "was denied the benefits of the program solely by reason of" his or her disability. *See O'Guinn v. Lovelock Corr. Ctr.,* 502 F.3d 1056, 1060 (9th Cir. 2007). The Ninth Circuit noted that "there is no significant difference in analysis of the rights and obligations created by [Title II of] the ADA and the Rehabilitation Act." *See Pierce v. County of Orange,* 526 F.3d 1190, 1217 n.27 (9th Cir.), *cert. denied,* -- U.S. --, 129 S.Ct. 597, 172 L.Ed.2d 456 (2008). Thus, just as with an ADA claim, a plaintiff raising a Rehabilitation Act claim must show that "a

policymaker acted with at least deliberate indifference to the strong likelihood that a violation of federally protected rights will result from the implementation of the challenged policy ... [or] custom." *See Powers*, 184 F.3d at 1153.

In the context of an Eighth Amendment claim, some courts have required plaintiffs to provide expert medical testimony articulating a standard of care for the ultimate determination of deliberate indifference. *See, e.g., Monroe v. Myers*, No. 05-cv-00351-WYD, 2006 WL 2361812, at *4 & *13 (D. Colo. Aug. 15, 2006) ("[o]nly by presenting such testimony through a medical expert can Plaintiff meet the test that is required to demonstrate the existence of deliberate indifference on the part of the Defendant.") (citing *Estate of Cole by Pardue v. Fromm* 94 F.3d 254, 261-62 (7th Cir. 1996) ("deliberate indifference may be inferred based upon a medical professional's erroneous treatment decision only when the medical professional's decision is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible did not base the decision on such a judgment"). Others, however, assert that any failure to meet the standard of care does not necessarily demonstrate deliberate indifference. *See Estelle*, 429 U.S. at 106 (even if established that a defendant's conduct fell below the standard of care, that would amount at most to negligence, not deliberate indifference); *see also Gobert v. Caldwell*, 463 F.3d 339, 349 (5th Cir. 2006) ("deliberate indifference exists wholly independent of an optimal standard of care").

The parties cite, and the Court has found, no case law concerning the admission of expert testimony regarding a "standard of care" in ADA or Rehabilitation Act cases. Thus, the Court will look generally to the applicable evidentiary rules. *See Federal Deposit Ins. Corp. v. Refco Group, Ltd.*, 184 F.R.D. 623, 629 (D. Colo. 1999). "Evidence which is not relevant is not admissible." Fed.

20

R. Evid. 402.  "'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."  Fed. R. Evid. 401.

Expert testimony, which will assist the trier of fact to understand the evidence or to determine a fact in issue, may be admitted under Fed. R. Evid. 702, if relevant and not otherwise excluded.  *Refco*, 184 F.R.D. at 629-30.  To warrant the use of expert testimony, (1) the subject of the inference must be so distinctly related to some science, profession, business or occupation as to be beyond the knowledge of the average layman, and (2) the witness must have such knowledge or experience in that field or calling as to make it appear that his or her opinion or inference will probably aid the trier of fact in his or her search for truth.  *Id.* at 30 (citing *Fineberg v. United States*, 393 F.2d 417, 420 (9th Cir. 1968)).  "Rule 702 indicates the desirability of testimony by a qualified expert if it will assist the trier of fact."  *Id.*

In determining whether expert evidence will be helpful, the Court must consider the "state of knowledge presently existing about the subject of the proposed testimony" in light of the facts of the case.  *Id.* (citing *United States v. Brown*, 7 F3d 648, 651-52 (7th Cir. 1993)).  Here, the Court finds that Dr. Strain's knowledge and expertise regarding educational policies and practices in Colorado, professional standards in the field of special education, and behavioral interventions in the school setting would be helpful to the jury in this case.  At the same time, the Court finds that Dr. Strain's testimony concerning Ebonie's behaviors and Defendants' response to them may lead to confusion as duplicative of Dr. Huckabee's testimony and, thus, unhelpful to a jury.  *See* Fed. R. Civ. P. 403.

Plaintiff contends that, without Dr. Strain's testimony, "[a] jury of lay people will not have

the expertise to evaluate the reasonableness of the[ ] various justifications" provided by Defendants for restraint, such as "emergency, to respond to tantrums or other problem behavior, to threaten her to gain compliance, to facilitate classroom management, and to help her attend and facilitate learning." The Court disagrees. To the extent that the jury may lack knowledge concerning special education policies and the behaviors of special needs children, Dr. Strain will provide such information, and for knowledge concerning Ebonie's behaviors, Dr. Huckabee will testify. Armed with such information, a jury will then understand what it means to respond to an emergency or to problem behaviors or any of the other listed justifications. Under the *Brown* standard, then, it seems apparent that jurors will be able to interpret whether Ebonie engaged in problem behaviors, whether the District improperly addressed such behaviors and whether the District's conduct was reasonable and/or justified under the circumstances of this case. Dr. Strain need not testify in these regards.

Accordingly, the Court will deny in part Defendants' motion and allow Dr. Strain to testify at trial as to his knowledge regarding educational policies and practices in Colorado, professional standards in the field of special education, and behavioral interventions in the school setting, as well as his opinions set forth in paragraphs 5, 6 and 7 of his report <u>only</u> to the extent that they do not relate, nor are applied, to Ebonie.[8]   However, because Dr. Strain's opinions relating directly to Ebonie will be duplicative and may confuse the jury in its determination of the issues raised at trial, the Court will grant in part Defendants' motion and exclude Dr. Strain's testimony concerning Ebonie in this case.

---

[8]Notably, Dr. Strain testified at the hearing that, while he never observed Ebonie at Bessemer Academy, he relied on the information set forth in the Legal Center report for his conclusions concerning her restraint. Although unclear how much Dr. Strain relied upon the incorrect information concerning the investigator's observation of Ebonie at Bessemer, the Court remains concerned that any reliance on this information is improper.

3.     Paul Spragg

Dr. Paul Spragg, an Educational Psychologist, has been offered by the Defendants as their

rebuttal expert to the opinions and conclusions of Drs. Huckabee and Strain. Dr. Spragg earned his

Masters degree in Pediatric and Applied Developmental Psychology at the University of Colorado,

and his Ed.D. in School Psychology from the University of Northern Colorado in 1983. He has been

an Instructor and Clinical Instructor for the Department of Psychiatry at the University of Colorado

Health Sciences Center since 1987. Dr. Spragg has taught, published and presented on behavioral

issues in persons with developmental disabilities. Since 1993, Dr. Spragg is the Founder, President

and Executive Director for Developmental Disability Consultants, P.C. in Denver.

Plaintiff does not generally challenge Dr. Spragg's qualifications to rebut Plaintiff's experts

and, upon review of Dr. Spragg's curriculum vitae and his testimony at the hearing, the Court finds

that Dr. Spragg is sufficiently qualified by "knowledge, skill, experience, training, or education" to

render opinions in this case rebutting Dr. Huckabee's and Dr. Strain's opinions.

However, to the extent that Dr. Spragg intends to opine as to any law or legal issues in the

case, he concedes he is not qualified to do so. "It is critical that the district court determine 'whether

the evidence is genuinely scientific, as distinct from being unscientific speculation offered by a

genuine scientist.'" *Goebel v. Denver & Rio Grande Western R. Co.*, 346 F.3d 987, 992 (10th Cir.

2003) (citing *Mitchell*, 165 F.3d at 782). The purpose of a reliability inquiry is "to make certain that

an expert, whether basing testimony upon professional studies or personal experience, employs in

the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the

relevant field." *Id.* (quoting *Kumho Tire Co.*, 526 U.S. at 152).

Plaintiff contends that Dr. Spragg's use of the term "adaptive device" comes directly from

Colorado's statute and regulations concerning protection from restraint and that he should not be allowed to testify using the term in its legal sense or its meaning under the law.  The Court agrees; however, the Court also heard testimony from Dr. Huckabee and/or Dr. Strain in which they used the term "mechanical restraint," which, according to the Court's review, is also a term contained in the statute and regulations.  Therefore, the Court will exclude any testimony using the terms "adaptive device" and "mechanical restraint" as they are defined and used in the Colorado law and regulations concerning protection of persons from restraint.  As for any other law or legal issues, Dr. Spragg has no education, training or experience in the law; thus, he may not testify as to any other law or legal issues at trial,[9] and Plaintiff's motion to exclude is granted in this regard.

Likewise, Dr. Spragg may not speculate as to any party's intent in this case.  *See In re Rezulin Prods. Liability Litigation*, 309 F. Supp. 2d 531, 546 (S.D.N.Y. 2004) ("opinions on the intent, motives or states of mind of corporations, regulatory agencies and others have no basis in any relevant body of knowledge or expertise.").  Thus, Dr. Spragg may not express his opinions or beliefs concerning the intentions or motivations of any party with respect to use of the wraparound desk.  At the same time, to the extent that a party's intent or motive for use of the wraparound desk is made known to him, Dr. Spragg may opine as to the reasonableness of such intent or motive.[10] Plaintiff's motion is granted in part and denied in part with respect to her challenge concerning the

---

[9]Of course, the Court is also mindful that expert testimony as to the law governing the jury's deliberations violates Rule 702.  *See United States Aviation Underwriters, Inc. v. Pilatus Bus. Aircraft, Ltd.*, 582 F.3d 1131, 1150-51 (10th Cir. 2009).

[10]That is, just as Dr. Huckabee may testify concerning the reasonableness of an alleged intent to use the desk for punishment or other negative response to problem behaviors, Dr. Spragg may testify concerning the reasonableness of an alleged intent to use the desk for facilitating learning or other positive motives.

intent of the parties.

Finally, Dr. Spragg may not opine as to any other expert witness' credibility.  "The credibility of witness testimony is a matter left to the jury and generally is not an appropriate subject for expert testimony."  *Wilson*, 303 F.3d at 1219.  While Dr. Spragg may, of course, opine as to any challenges he makes to Dr. Strain's and/or Dr. Huckabee's methods or conclusions, he may not state that the expert witnesses are "biased" or "not credible."  Plaintiff's motion is granted in part and denied in part in this regard.

With respect to all other challenges made by the Plaintiff to Dr. Spragg's reports - for example, whether Dr. Spragg read the deposition testimony of Defendant Golden, whether he considered all evidence available to him and whether he based an opinion upon a misreading of a document identifying a "restraining" bar - the Court finds that these arguments go to the weight, rather than the admissibility, of Dr. Spragg's testimony.  Plaintiff's motion is denied with respect to these challenges.

Accordingly, the Court will grant in part Plaintiff's motion and exclude any testimony by Dr. Spragg concerning the term "adaptive device" as it is used in Colorado's statute and regulations, the law or legal issues in general, his beliefs as to the intents or motives of any party in this case and his opinion that Dr. Huckabee and/or Dr. Strain are "biased."  At the same time, the Court will deny in part Plaintiff's motion and allow Dr. Spragg to testify at trial concerning his opinions rebutting Dr. Huckabee's and Dr. Strain's testimony as set forth herein.

## IV.   Conclusion

Based upon the foregoing and the entire record before the Court, Defendants' Joint Motion to Exclude Expert Testimony of Dr. Phillip Strain [filed February 28, 2011; docket #122],

Defendants' Joint Motion to Exclude Expert Testimony of Dr. Helena Huckabee [filed February 28, 2011; docket #123], and Plaintiff's Motion to Exclude Proffered Expert Testimony of Paul Spragg [filed March 2, 2011; docket #128] are **granted in part and denied in part**.  Drs. Huckabee, Strain and Spragg may testify as experts at trial in this case; however, their testimony is restricted in certain respects as set forth herein.

Dated and entered this 5th day of May, 2011, at Denver, Colorado.

BY THE COURT:

Michael E. Hegarty
United States Magistrate Judge